# In the United States District Court for the Southern District of Georgia Brunswick Division

MADELENE SMITH, as the surviving spouse and wrongful death beneficiary of Hugh Max Smith, Jr., deceased,

    Plaintiff,

v.

WAYNE COUNTY, GEORGIA, et al.,

    Defendants.

2:23-CV-27

**ORDER**

Before the Court are motions to dismiss filed by Defendant Wayne County Administrator Ed Jeffords, dkt. no 13, and Defendants Wayne County, Wayne County Ambulance Services ("WCAS"), EMS Director Richard Johnson, E-911 Coordinator Donnie Ray, E-911 Dispatcher Jane Doe #1, and E-911 Dispatcher Jane Doe #2, dkt. no 15. In a motions hearing held May 15, 2023, the Court **DENIED** Defendants' motions and **ORDERED** Plaintiff to file an amended complaint within twenty-one days. See Dkt. No. 28. This Order serves to memorialize that ruling.

**FACTUAL BACKGROUND**

Plaintiff Madelene Smith initiated this action in January 2023 after the death of her husband, Hugh Smith. See generally Dkt. No. 1-1. On April 14, 2021, Mr. Smith began experiencing shortness of breath and trouble breathing after returning from his construction job on St. Simons Island, Georgia. Dkt. No. 9 ¶¶ 10-11. So, Plaintiff drove Mr. Smith to the emergency room at Wayne Memorial Hospital ("Hospital"). Id. After testing Mr. Smith's oxygen saturation levels, performing diagnostics, and executing a walking test, an emergency room physician and respirologist agreed that because Mr. Smith's oxygen saturation had remained around 91% during his four hours in the emergency room, he did not require oxygen supplementation. Id. ¶ 18. The emergency room physician "suspected" Mr. Smith "contracted COVID-19 and had symptoms of pneumonia." Id. The attending physician then diagnosed Mr. Smith with pneumonia "recommended discharge based on Mr. Smith's slightly low but consistently stable oxygen saturation at 91%." Id. ¶ 19. Upon discharge, Mr. Smith was provided with some medications and a series of prescriptions, and he was told to obtain an oximeter to monitor his oxygen levels. Id. ¶ 20. The emergency room physician explained to Plaintiff and Mr. Smith that "although [Mr. Smith's] oxygen saturation appeared stable, . . . the level was low and of concern, and given the doctor's findings of pneumonia that it was imperative that Plaintiff and her husband

2

constantly monitor his oxygen saturation level." Id. ¶ 21. The emergency room physician also expressed concern about Mr. Smith's pending COVID-19 test and recommended Mr. Smith "follow-up with his primary care physician within 24 to 28 hours." Id. ¶¶ 20–21. Further, and "[m]ost importantly, the emergency room physician admonished Plaintiff and Mr. Smith that should his oxygen levels drop below 88% or if his respiratory situation worsened in any way that this was an emergency requiring immediate return to [the Hospital] emergency room." Id. ¶ 22. Mr. Smith was discharged at approximately 8:30 p.m. Id. ¶ 20.

After arriving home from the Hospital, Mr. Smith "started to perceive that he was once again having difficulty breathing or getting enough air and felt it necessary to sit down in a chair." Id. ¶ 24. Plaintiff and Mr. Smith used the oximeter to check his oxygen saturation level, which showed that Mr. Smith's "oxygen level had dropped into the low 80s, and within minutes of that reading it had dropped to 79." Id. It was clear to Plaintiff and Mr. Smith "that this was a medical emergency," and pursuant to the "strict instructions" of the emergency room physician, "Plaintiff immediately called 911 to avail herself and Mr. Smith of Wayne County's emergency medical services as instructed." Id. ¶¶ 24, 26.

Plaintiff first called 911 at 10:19 p.m., and the call lasted for one minute and twenty-four seconds, ending at approximately 10:21 p.m. Id. ¶¶ 34, 44. Defendant Jane Doe #1 answered the call,

3

and Plaintiff explained Mr. Smith's urgent medical situation and need for an ambulance. Id. ¶¶ 36-37. Plaintiff informed Defendant Jane Doe #1 that Mr. Smith was almost fifty years old, and his specific oximeter reading was 79. Id. ¶¶ 38-39. Plaintiff also "explained that Mr. Smith had just left the emergency room, had been diagnosed with pneumonia, and that they told him (referring to [Hospital] medical professionals) if his oxygen saturation dropped below 88, he needed to get back to the hospital." Id. ¶ 41. Defendant Jane Doe #1 then told Plaintiff, "[a]lright we'll get them sent out for you," "referring to the ambulance Plaintiff requested." Id. ¶ 42.

Despite Plaintiff's "description of this very real medical emergency," and Mr. Smith's "life-threatening deficiency in his oxygen saturation," id. ¶ 46, "[a]t no time during the call did Defendant Jane Doe #1 offer to stay on the line with Plaintiff until an ambulance arrived, advise her as to when an ambulance could be expected, or advise Plaintiff as to any life-preserving or life-saving techniques that might help Mr. Smith until EMTs could arrive," id. ¶ 45. After the call, Plaintiff observed that Mr. Smith's condition seemed to worsen, as he began breathing more rapidly, "sweating profusely," and "audibly gasping for air." Id. ¶ 47.

At approximately 10:37 p.m., eighteen minutes after Plaintiff first called 911, and sixteen minutes after that call ended, no

4

ambulance had arrived at Plaintiff's residence. Id. ¶ 48. Though a "sickening feeling began to sink in, as [Plaintiff] realized she could have driven [Mr. Smith] to the hospital herself by 10:30 p.m.," she knew that calling 911 was the "right thing" because "[t]his was an emergency and that is what you are supposed to do," and because "Mr. Smith needed medical help she could not provide, namely oxygen supplementation . . . coupled with fast emergency ambulance transport back to the emergency room at [the Hospital]." Id. ¶¶ 48, 49.

Because eighteen minutes had passed since her first call, "Plaintiff again dialed 911 to seek reassurance an ambulance was in fact on its way." Id. ¶ 50. At approximately 10:37 p.m., Plaintiff reached dispatcher Defendant Jane Doe #2. Id. ¶ 51. Plaintiff told Defendant Jane Doe #2, "[t]here is supposed to be an ambulance coming to 400 Old Oak Road" and asked when they would arrive to her residence. Id. ¶ 52. In response, Defendant Jane Doe #2 explained to Plaintiff that she did not have "an 'ETA' on them or anything like that," but that the ambulance was "on the way." Id. ¶ 53. Plaintiff also inquired as to whether she should just drive Mr. Smith to the Hospital to get there more quickly, but Defendant "Jane Doe #2 replied, '[u]m . . . well, they're on the way, so I figure . . . I mean they should be there any time.'" Id. ¶¶ 54-55. On two occasions during the call, Defendant Jane Doe #2 exhibited a "seemingly pained and emotional breath after her

5

answer[s]" to Plaintiff. Id. ¶¶ 53, 55. Plaintiff's second 911 call was fifty seconds long, ending at 10:38 p.m., and "at no time during the call did [Defendant] Jane Doe #2 offer to stay on the line with Plaintiff until the ambulance arrived, nor did she advise Plaintiff as to any life-preserving or life-saving techniques" to help Mr. Smith. Id. ¶¶ 57–58. After the second 911 call, Plaintiff watched her husband's condition "deteriorat[e] before her eyes . . . [as] [s]he assured him that the ambulance would be there soon." Id. ¶ 59.

At approximately 10:44 p.m., six minutes after the second 911 call ended, and twenty-five minutes after the initial 911 call, a fire truck from the City of Jesup Fire Department arrived at Plaintiff's residence. Id. ¶¶ 60–61. The two firefighters were unaware of Mr. Smith's condition and had no supplemental oxygen. Id. ¶¶ 62–64. Additionally, the firefighters could not render medical aid to Mr. Smith or transport him to the Hospital. Id. ¶¶ 65–66. "[A]fter trying to answer Plaintiff's questions, one of the firefighters exclaimed to Plaintiff that 'an ambulance is not coming!' He told Plaintiff that she should immediately drive Mr. Smith to the [Hospital] emergency room herself." Id. ¶ 67. Plaintiff "could not believe what was happening but immediately sprang into action" to drive Mr. Smith to the hospital, and though the firefighters helped Plaintiff get Mr. Smith in her car, they

did not offer to escort Plaintiff with their lights and sirens. Id. ¶¶ 67-69.

Plaintiff drove to the Hospital "as fast as she could," id. ¶ 72, but "[j]ust before Plaintiff pulled into the [Hospital] emergency drop-off area," Mr. Smith's "hand jerked out of Plaintiff's hand, and his body moved into a rigid and involuntary flex while grimacing in pain with his teeth jutting out behind pursed lips," id. ¶ 73. Plaintiff then "jumped out of the car and began screaming, 'My husband is dying! I need help!'" Id. ¶ 74. Then, "[a]fter getting the attention of [Hospital] personnel to assist in moving Mr. Smith into the emergency room, he was officially admitted to [the Hospital] at 11:00 p.m." Id. ¶ 75.

Mr. Smith had suffered cardiac arrest in the Hospital emergency room drop-off area "caused by a lack of oxygen saturation and the resulting acute respiratory and pulmonary distress," id. ¶ 76, and doctors and nurses at the Hospital "were able to restart his heart and get his oxygen saturation to 95%," id. ¶ 77. However, Mr. Smith "never awakened." Id. ¶ 78. According to the complaint, "[t]esting revealed that he had suffered an anoxic brain injury from lack of oxygen to the brain." Id.

On April 15, 2021, Mr. Smith was air-transported to the Mayo Clinic, but "[d]octors determined that his brain function would not return and recommended discontinuation of life support." Id. ¶ 79. So, "Plaintiff finally and with great sadness accepted the

7

recommendation of her husband's Mayo Clinic treatment team and gave permission to remove him from life support." Id. ¶ 80. Mr. Smith died on April 19, 2021. Id. ¶ 81. Mr. Smith's "official cause of death is listed as a result of the anoxic brain injury, cardiac arrest, and systolic heart failure." Id.

In the amended complaint, Plaintiff alleges Defendants violated seven Georgia Department of Public Health ("DPH") rules and regulations that "must be adhered to in order for the WCAS to maintain its licensures with the state." Id. ¶ 91. Plaintiff also alleges "all defendants were keenly aware that [Wayne] County had been operating its ambulance service in a manner that was well below industry standards and contrary to state law and Georgia Department of Health regulations," id. ¶ 82, and indiscriminately includes several paragraphs describing statements made by some of the defendants at Wayne County Board of Commissioners meeting, id. ¶¶ 83-89, 92, 101-105, 107. She also alleges specific causes of action against Defendants Wayne County, WCAS, Jeffords, Johnson, Ray, Jane Doe #1, and Jane Doe #2, spanning eleven counts and 179 paragraphs. See Dkt. No. 9 ¶¶ 117-296. Altogether, Plaintiff's complaint is fifty-seven pages and 296 paragraphs long. Id. ¶¶ 1-296.

**Procedural Background**

Plaintiff initiated this action on January 12, 2023, in Wayne County Superior Court. Dkt. No. 1-1. On February 20, 2023,

8

Defendants filed a Notice of Removal in this Court. Dkt. No. 1.[1] Thereafter, Defendants moved for a more definite statement of Plaintiff's claims, pursuant to Federal Rule of Civil Procedure 12(e). Dkt. Nos. 5, 6. Then, on March 9, 2023, Plaintiff filed an amended complaint pursuant to Federal Rule of Civil Procedure 15(a)(1)(B) on March 9, 2023. Dkt. No. 9. On the same day, Plaintiff also filed a response to Defendants' motions, including a detailed chart, acknowledging specific pleading deficiencies that the amended complaint purported to rectify. Dkt. No. 10.

Defendants now move to dismiss the amended complaint. Dkt. Nos. 13, 15. Defendants argue that Plaintiff's amended complaint is a shotgun pleading, and that because Plaintiff has already amended her complaint once, the Court should dismiss the amended complaint with prejudice, providing no leave to amend. Dkt. Nos. 13, 15.

**Legal Standard**

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). And the form matters as well: "[a] party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(b). Further, "[i]f doing so would promote clarity, each

---

[1] Defendant Jeffords filed his consent to removal of this action, dkt. no. 1, on February 21, 2023. Dkt. No. 3.

claim founded on a separate transaction or occurrence . . . must be stated in a separate count or defense." Id. "The 'self-evident' purpose of these rules is 'to require the pleader to present his claims discretely and succinctly, so that[ ] his adversary can discern what he is claiming and frame a responsive pleading.'" Barmapov v. Amuial, 986 F.3d 1321, 1324 (11th Cir. 2021) (alteration in original) (quoting Weiland v. Palm Beach Cnty. Sheriff's Office, 792 F.3d 1313, 1320 (11th Cir. 2015)). "These rules were also written for the benefit of the court, which must be able to determine 'which facts support which claims,' 'whether the plaintiff has stated any claims upon which relief can be granted,' and whether evidence introduced at trial is relevant." Id. (quoting Weiland, 792 F.3d at 1320).

Complaints that violate some or all of these rules are sometimes called "shotgun pleadings." Labels aside, the point is that they do not live up to the rules' pleading standards, and they make it difficult both for the opposing party to frame a response and for the Court to control the proceedings and decide the legal issues. See Weiland, 792 F.3d at 1320, 1323; see also Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955, 979 (11th Cir. 2008).

There are four "rough" types of shotgun pleadings. Weiland, 792 F.3d at 1321. "The first type is a complaint containing 'multiple counts where each count adopts the allegations of all

10

preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint.'" Roether v. Georgia, No. 2:21-CV-083, 2022 WL 1477436, at *3 (S.D. Ga. May 10, 2022) (quoting Weiland, 792 F.3d at 1321). The second is a complaint "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." Weiland, 792 F.3d at 1321–22. The third is one that fails to separate different claims for relief into separate counts. Roether, 2022 WL 1477436, at *3. "Finally, the fourth type is a complaint that contains 'multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.'" Id. (quoting Weiland, 792 F.3d at 1322). Overall, though, "[t]he unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." Weiland, 792 F.3d at 1323 (footnote omitted).

## Discussion

### I. Defendants' Motions to Dismiss

Defendants contend that Plaintiff's amended complaint is a shotgun pleading and seek dismissal with prejudice. See generally Dkt. No. 13 at 8; Dkt. No. 15 at 13–15.

11

**A. Plaintiff's amended complaint is not "too long."**

As an initial matter, Defendants' contention that the length of the amended complaint is a major defect, dkt. no. 13 at 5, 8-11; dkt. no. 15 at 2, 6-7, is misplaced. Length alone does not define a shotgun pleading, and compared to precedent from this Court and beyond, the amended complaint is not outrageously long. See GEICO v. AFO Imaging, Inc., No. 8:20-CV-2419, 2021 WL 734575, at *6 (M.D. Fla. Feb. 25, 2021); see also, e.g., Jones Creek Inv., LLC v. Columbia Cnty., Ga., No. 111-174, 2011 WL 7446782, at *4 (S.D. Ga. Dec. 9, 2011) (complaint was a shotgun pleading where it comprised 174 pages with 322 paragraphs in the statement of facts alone); United States v. Lockheed–Martin Corp., 328 F.3d 374, 376-78 (7th Cir. 2003) (describing a pleading that "broke the scale at 109 pages containing 345 numbered paragraphs" and noting that "length and complexity may doom a complaint by obfuscating the claim's essence"); Byrne v. Nezhat, 261 F.3d 1075, 1128-34 (11th Cir. 2001), abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639 (2008) (complaint was seventy-eight pages long and had 299 paragraphs and nine claims for relief).

Further, Plaintiff's amended complaint does not make it impossible for Defendants to frame a reasoned response. See Hearns v. San Bernardino Police Dep't, 530 F.3d 1124, 1130 (9th Cir. 2008) (sixty-eight-page complaint alleging seventeen claims was nonetheless intelligible). In fact, Defendant Jeffords was able to

12

intelligibly summarize most of Plaintiff's counts in his briefing, identifying the claims and the defendants against whom each claim was brought and noting where the counts needed clarity. See Dkt. No. 23 at 5-7. Thus, if the complaint here is more verbose than necessary, "the length [alone] does not make it so that [the defendant is] unable to prepare a proper response." GEICO, 2021 WL 734575, at *6 (citing Bailey v. Janssen Pharmaceutica, Inc., 288 F. App'x 597, 603 (11th Cir. 2008)).

### B. Plaintiff's amended complaint is a shotgun pleading.

Defendants argue that Plaintiff's amended complaint qualifies as a shotgun pleading under all four categories. Defendants first assert the amended complaint falls into the first category of shotgun pleadings because each of the eleven counts incorporate almost every factual allegation in paragraphs 1-116. Dkt. No. 13 at 14-16; Dkt. No. 15 at 9-10.

Looking at the amended complaint, even though each count incorporates almost all the facts asserted, only *one count* adopts the allegations of a preceding *count*. The Court concludes Plaintiff's amended complaint does not evince the defect of the first type of shotgun pleading because it does not "caus[e] each successive count to carry all that came before and the last count to be a combination of the entire complaint." Weiland, 792 F.3d at 1321 (footnote omitted).

Plaintiff's amended complaint also does not fall into the fourth type of shotgun pleading, where "multiple claims [are asserted] against multiple defendants without specifying which of the defendants are responsible for which acts or omissions," id. at 1323, because "even though several of the counts target multiple defendants, these counts do 'specify[] which of the defendants are responsible for which *acts or omissions*.'" Barmapov, 986 F.3d at 1325 (quoting Weiland, 792 F.3d at 1323) (emphasis added).

Plaintiff's amended complaint does, however, fall into the second and third types of shotgun pleadings described in Weiland.

Defendants correctly note that the amended complaint falls within the second shotgun pleading category because it is "replete with conclusory, vague, and immaterial facts not connected to any cause of action." Dkt. No. 13 at 12-14; Dkt. No. 15 at 6-9. Plaintiff's amended complaint certainly bears this flaw, as it includes several irrelevant details, including allegations describing Plaintiff and Mr. Smith's trip to a drive-thru, dkt. no. 9 ¶ 23, and efforts by Defendant Wayne County to recruit 911 dispatchers, see id. ¶ 28, and it contains multiple paragraphs describing general concern toward government, see, e.g., id. ¶ 165 ("[M]ost reasonable people, when they discover a government lie punish the officials that caused the lie or rebel against such tyranny by supporting officials and candidates that promise to change the system.").

Plaintiff's complaint also falls into the third category of shotgun pleadings because it piles multiple causes of action into a single count. Roether, 2022 WL 1477436, at *3. For example, as Defendants correctly note, Count One "intertwine[s] three separate claims," Count Four "appears to allege at least two separate claims," and Count Five "appears to allege [both] negligence and 'willful' violations against multiple defendants." Dkt. No. 13 at 15-16; Dkt. No. 15 at 11-13 (noting the same defect in Count One, among other defects). The amended complaint also "insert[s] the names of many or all Defendants into a number of paragraphs that previously made reference only to 'Defendants,' but these changes only add to the confusion about which Defendants are being sued under which theories of recovery and why." Dkt. No. 15 at 11; Dkt. No. 13 at 12-13 (noting examples where the amended complaint fails to explain how certain paragraphs "relate[] to any defendant or cause of action").

The Court finds Plaintiff's amended complaint is a shotgun pleading because it "fail[s] . . . to give . . .[D]efendants adequate notice of the claims against them and the grounds upon which each claim rests." Weiland, 792 F.3d at 1322 (footnote omitted). However, because the Court must give Plaintiff an opportunity to cure the deficiencies in her amended complaint, Defendants' motions to dismiss are **DENIED** at this time.

15

**II.  Plaintiff is granted leave to amend.**

Defendants suggest that, because Plaintiff already amended her original complaint in response to their respective motions for more definite statement,[2] the Court should dismiss Plaintiff's complaint with prejudice upon finding it is a shotgun pleading. Dkt. Nos. 13, 15. Defendants urge that the Eleventh Circuit's decision in Jackson v. Bank of America, 898 F.3d 1348 (11th Cir. 2018), supports this argument. Dkt. No. 13 at 8-11; Dkt. No. 15 at 14.

In Jackson, the plaintiffs who had filed a shotgun complaint stated they did *not oppose* the defendants' motions for a more definite statement and moved for leave to amend the complaint; the court therefore *granted* the defendants' motions and *granted* plaintiffs leave to amend. 898 F.3d at 1353-54. The plaintiffs then filed an amended complaint, which was also a shotgun pleading. Id. at 1354. However, the defendants moved to dismiss based not on shotgun pleading grounds but for failure to state a claim for relief. Id. On appeal, the Eleventh Circuit affirmed the district

---

[2] Plaintiff, on the other hand, contends Defendants "should be precluded from filing any further motions under Rule 12(e) as they have waived their right to allege deficiencies in the Amended Complaint by failing to raise specific, corresponding allegations as to the original complaint." Dkt. No. 10 at 6-7. This contention is misguided, as Defendants' previous motions for a more definite statement were denied as moot, and the Court explicitly provided Defendants an opportunity to renew their motions at the appropriate time. See Dkt. No. 11. Thus, Defendants have not waived their right to allege deficiencies in the amended complaint.

16

court's dismissal with prejudice but for a different reason: the amended complaint was an "incomprehensible shotgun pleading," id. at 1356, and the court had already given plaintiffs "one chance to remedy such deficiencies," id. at 1358.

Defendants argue that Plaintiff, like the plaintiffs in Jackson, was put on notice of the defects in her original complaint through Defendants' motions for more definite statement. Dkt. No. 13 at 11; Dkt. No. 15 at 15. They therefore argue dismissal with prejudice is required. Dkt. No. 13 at 11, 16–17; Dkt. No. 15 at 15. However, Defendants' reliance on Jackson is misplaced.

Here, Plaintiff filed her amended complaint as a matter of course pursuant to Rule 15(a)(1), therefore, she did not require the Court's leave to "give [her] 'one chance to remedy such deficiencies'" in her original complaint. Jackson, 898 F.3d at 1358 (quoting Vibe Micro, Inc. v. Shabanets, 878 F.3d 1291, 1295 (11th Cir. 2018)). Further, unlike in Jackson, Defendants' motions for more definite statement were denied as moot, thus, the Court did not rule on the merits of those motions. See generally Dkt. No. 11 (order denying Defendants' motions for a more definite statement as moot).

It might be true that Plaintiff was apprised of some of the deficiencies in her original complaint by virtue of Defendants' motions for more definite statement, however, the Court must still provide Plaintiff "one chance to remedy [the] deficiencies" in her

17

pleading. Jackson, 898 F.3d at 1358 (quoting Vibe Micro, 878 F.3d at 1295).

Accordingly, the Court **ORDERS** Plaintiff to file an amended complaint within twenty-one days from May 15, 2023.[3] See Vibe Micro, 878 F.3d at 1295 ("In the special circumstance of non-merits dismissals on shotgun pleading grounds, we have required district courts to sua sponte allow a litigant one chance to remedy such deficiencies." (first citing Wagner v. First Horizon Pharm. Corp., 464 F.3d 1273, 1280 (11th Cir. 2006); then citing Byrne, 261 F.3d at 1133; and then citing Magluta v. Samples, 256 F.3d 1282, 1284-85 (11th Cir. 2001) (per curiam))).[4] "In these cases, even if the parties do not request it, the district court 'should strike the complaint and instruct counsel to replead the case—if

---

[3] May 15, 2023 is the date the Court issued its oral order. See Dkt. No. 28.

[4] It is true that the Eleventh Circuit has held that a "district court is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court." Wagner v. Daewoo Heavy Indus. Am. Corp., 314 F.3d 541, 542 (11th Cir. 2002) (en banc). However, the Eleventh Circuit has also made clear that

> "[a]lthough the Byrne line of cases requires one sua sponte chance to amend a shotgun pleading, Daewoo operates in the background. After that one Byrne opportunity to replead comes and goes, Daewoo's rule operates to allow the district court to dismiss with prejudice if the party has still neither filed a complaint pleading nor asked for leave to amend."

Vibe Micro, 878 F.3d at 1296.

18

counsel could in good faith make the representations required by Fed. R. Civ. P. 11(b).'" Vibe Micro, 878 F.3d at 1295 (quoting Byrne, 261 F.3d at 1133 n.113).

Allowing Plaintiff leave to amend "'ensures that the issues get defined at the earliest stages of litigation' while also weighing the important concerns upon which Daewoo rested, including judicial efficiency, finality, and limiting lengthy delays or abuse of the courts." Id. (quoting Byrne, 261 F.3d at 1133 n.113).

The Court finds it necessary to emphasize that this Order does not exhaustively identify all the amended complaint's deficiencies—it is Plaintiff's obligation to identify and address each statement or allegation that does not comply with Federal Rule of Civil Procedure 8(a)(2). Plaintiff's failure to timely file a second amended complaint that conforms to Rule 8(a)(2) will result in her claims being dismissed with prejudice. Id. at 1295 ("This initial repleading order comes with an implicit 'notion that if the plaintiff fails to comply with the court's order—by filing a repleader with the same deficiency—the court should strike his pleading or, depending on the circumstances, dismiss his case and consider the imposition of monetary sanctions.'" (quoting Byrne, 261 F.3d at 1133)).

**CONCLUSION**

Defendants' motions to dismiss with prejudice, dkt. nos. 13, 15, are **DENIED** at this time. Plaintiff is **ORDERED** to file an amended complaint that conforms with Rule 8(a)(2) within **twenty-one (21) days** of May 15, 2023.

**SO ORDERED** this 31st day of May, 2023.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA